Signed and Filed: May 31, 2017

HANNAH L. BLUMENSTIEL
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | ) Case No. 13-30477 HLB |
| | ) |
| MONICA H. HUJAZI, | ) Chapter 7 |
| | ) |
| Debtor. | ) |
| _____ | ) |
| STERLING HEATLEY, | ) Adv. Proc. No. 16-3027 HLB |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MONICA H. HUJAZI, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

### MEMORANDUM DECISION FOLLOWING TRIAL

On May 10, 2017, the court convened a trial on the complaint filed by Plaintiff Sterling Heatley.  After Mr. Heatley closed and submitted his case-in-chief, the court issued an oral decision pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, which applies in this adversary proceeding pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  The court found and concluded that Mr. Heatley had failed to prove facts that enabled him to prevail on the claims asserted in his complaint.

MEMORANDUM DECISION FOLLOWING TRIAL

-1-

This is a core proceeding over which the court has subject matter jurisdiction pursuant to 28 U.S.C. §157(b)(2)(I) and in which it may enter a final judgment. This Memorandum Decision – in addition to the court's oral ruling of May 10 – constitutes the findings of fact and conclusions of law required by Rules 52(a) and 52(c) of the Federal Rules of Civil Procedure.

## I.   FINDINGS OF FACT

Mr. Heatley became acquainted with Ms. Hujazi when he was a 23 year old novice real estate investor and agent, making "cold calls" to drum up business. They remained in touch and, in 2011, Mr. Heatley was involved as a buy-side agent in Ms. Hujazi's sale of real property located on 22nd Street in San Francisco.

Some months later, Mr. Heatley became interested in two properties that he viewed as good investments. The first, 376 Ellis Street, San Francisco ("Ellis"), was an "off market" opportunity to which Mr. Heatley was introduced by a friend. Ellis is a residential apartment building with commercial space on the ground level. Mr. Heatley understood that Ellis' owner was trying to fend off foreclosure and was anxious to sell. Ms. Hujazi and Mr. Heatley do not dispute that Ellis was distressed, meaning that many of its commercial and residential units were vacant, that many of its tenants were not paying rent, and that there were many repair and maintenance problems. The building is located in a rough neighborhood, which contributed to the foregoing problems.

The second property, 2400-2424 Bayshore Boulevard, San Francisco ("Bayshore"), was similarly situated to Ellis in terms of its mix of commercial and residential space; its neighborhood; and its tenancy, vacancy, and maintenance challenges.

Despite the problems associated with Ellis and Bayshore, Mr. Heatley believed he could turn them into profitable enterprises by making certain improvements, such as evicting non-paying tenants, improving security, renovating rental units and common areas, and securing stable tenants. Despite lacking the cash to pay for these improvements himself, Mr. Heatley entered into contracts to purchase Ellis and Bayshore. He then began to search for a partner and, during the course of that search, turned to Ms. Hujazi, who expressed interest.

On January 31, 2012, Mr. Heatley and Ms. Hujazi entered into an "Agreement to Assign Residential Income Property Purchase Agreement and Joint Escrow Instructions" with respect to Ellis (the "Ellis Assignment Agreement"). Pursuant to the Ellis Assignment Agreement, Mr. Heatley assigned to Ms. Hujazi his rights under a "Residential Income Property Purchase Agreement and Joint Escrow Instructions dated January 3, 2012" (the "Ellis Purchase Agreement"). As consideration for the Ellis Assignment Agreement, Ms. Hujazi agreed to pay to Mr. Heatley the sum of $100,000, "to be in the form of equity stock in 376 Ellis Street LLC."[1]

---

[1] The court received no evidence proving that 376 Ellis Street LLC was ever formed; rather, Mr. Heatley testified that, although he was not sure, he believed that 376 Ellis Street LLC was a "dba" that he and Ms. Hujazi used for purposes of managing Ellis. Despite the fact that 376 Ellis Street LLC does

On June 18, 2012, Mr. Heatley and the Zuercher Trust of 1999 ("Zuercher"), a business trust of which Ms. Hujazi was the sole trustee and principal beneficiary, entered into an "Agreement to Assign Residential Income Property Purchase Agreement and Joint Escrow Instructions" with respect to Bayshore (the "Bayshore Assignment Agreement"). Pursuant to the Bayshore Assignment Agreement, Mr. Heatley assigned to Zuercher his rights under a "Residential Income Property Purchase Agreement and Joint Escrow Instructions" (the "Bayshore Purchase Agreement") in exchange for "an ownership interest in [Zuercher] equivalent to a capital contribution in the amount of $100,000 or an 11.5% interest in 2400 Bay Shore Blvd LLC when it is established."[2] In addition, Zuercher agreed "to contribute $100,000 towards the immediate capital improvements of [Bayshore]."

Ms. Hujazi paid approximately $650,000 - $700,000 of each of the purchase prices for Ellis and Bayshore. The balance of the purchase price for each property was funded by a loan, which was secured by a first deed of trust on each property. The court received no evidence identifying the lender or the

---

not appear to have existed as a legal entity, the parties do not dispute that Mr. Heatley acquired an 11.5% ownership interest in Ellis, although no grant deed or other documentary proof of ownership was ever introduced into evidence. The parties also do not dispute that, at some point, Ms. Hujazi transferred or otherwise arranged for her 89.5% interest in Ellis to be held by SF Corners LLC ("SF Corners"), a California limited liability company of which she is the sole member and manager.

[2] The court received no evidence that 2400 Bay Shore Blvd LLC was ever formed or that Mr. Heatley received an ownership interest in Zuercher. The parties do not dispute, however, that Mr. Heatley acquired an 11.5% ownership interest in Bayshore, although no grant deed or other indicia of ownership was ever introduced into evidence.

Case: 16-03027    Doc# 31    Filed: 05/31/17    Entered: 05/31/17 15:22:35    Page 4 of 31

amount of the loan pertaining to Bayshore, but Mr. Heatley did introduce the promissory note and deed of trust pertaining to Ellis. These documents prove that the lender was Sequoia Mortgage Capital, Inc. ("Sequoia") and that the borrowers/trustors were SF Corners and Mr. Heatley. The Deed of Trust was recorded on March 26, 2012. The principal amount of the promissory note was $1,300,000.

From the time of the acquisition of Ellis and Bayshore until early 2014, Mr. Heatley served as property manager. He took on responsibility for hiring a contractor to make repairs and improvements, collecting rents, securing new tenants, etc. At that time and at all times relevant to this dispute, Mr. Heatley had unfettered access to the bank accounts he and Ms. Hujazi established for each property for the purposes of depositing rental income and paying expenses. Although he complained that he did not have a debit card or checks for the Ellis bank account, he offered no explanation as to why he could not have gotten those ubiquitous items of convenience, for Ms. Hujazi did so with no apparent difficulty.

Managing Ellis and Bayshore proved difficult, given the myriad problems from which the properties suffered. Mr. Heatley lays all of this at Ms. Hujazi's feet, claiming that, had she made the $100,000 capital contributions Mr. Heatley contends she promised to provide, he could have made the improvements he deemed immediately necessary to stabilize the buildings and ultimately turn them around.

Ms. Hujazi claims she put some money in to each property, but the court received no evidence as to when or how much. And

between the time her entities and Mr. Heatley acquired the
properties and early 2014, Ms. Hujazi was dealing with many
personal and professional distractions.  First and foremost,
her mother was very ill and ultimately passed away.  In
addition, some of her other real estate projects were causing
her great stress and financial pressure.  The parties do not
dispute that the drama in Ms. Hujazi's personal and
professional life prevented her from participating in the day-
to-day management of Ellis and Bayshore.

   Not surprisingly, Ms. Hujazi blames Mr. Heatley for the
failure to turn Ellis and Bayshore around.  She claims that,
when he approached her as a potential partner, she immediately
recognized that stabilizing the properties would not be a "walk
in the park."  She claims that she repeatedly told Mr. Heatley
that he would have to be a very hands-on manager.  She also
claims that she gave him carte blanche to do whatever he needed
to do with the rental income from the properties in order to
turn them around.

   In early 2014, however, Ms. Hujazi claims she learned for
the first time that real property taxes had not been paid for
Ellis.  She also maintains that, once she became aware of this
issue, she also concluded that the assessed value for Ellis was
$1.0 million too high.  But, Ms. Hujazi claims, it was by then
too late to challenge the assessed value.  For this, too, Ms.
Hujazi blames Mr. Heatley, explaining that he had arranged for
mail concerning Ellis to be delivered to the office from which
he ran his real estate agent business, to which Ms. Hujazi did
not have access.

At around the same time, Ms. Hujazi claims, she learned that the contractor hired by Mr. Heatley to do much of the construction work needed to renovate Ellis and Bayshore lacked a valid contractor's license and had done much of the work poorly and without the required permits. These problems, among others, caused Ms. Hujazi to step in and take over management of the properties.

According to Ms. Hujazi, she threw herself headlong into efforts to work with the City of San Francisco to obtain approvals of the unpermitted construction work, to clear other code violations, to re-do shoddy construction, to clear trash from the building, to evict non-paying tenants, and to rent vacant commercial and residential units. Ms. Hujazi testified that within three months of taking over the management of Ellis, she had increased monthly rental income from $29,000 to $41,000.[3] While she might have been successful in improving Ellis' monthly rent rolls, her heavy-handed approach did nothing to improve her relationship with Mr. Heatley, which was by then quite strained.

According to Mr. Heatley, Ellis did not generate income sufficient to pay the building's operating expenses. He was forced on many occasions, he claims, to pay operating expenses out of his own pocket, to the tune of approximately $150,000. While he admits that he was reimbursed for a portion of these expenditures, he claims that more than $100,000 remains

---

[3] Ms. Hujazi introduced no documentary evidence to corroborate her testimony on this point, but Mr. Heatley did not challenge her testimony.

outstanding and he demands that this "debt" be declared nondischargeable.

Mr. Heatley also grew increasingly frustrated by what he characterizes as Ms. Hujazi's willful refusal to give him copies of rent rolls, profit and loss statements, tax documents, etc. Eventually, he says, he was forced to obtain copies of bank statements directly from the bank and to try to recreate Ellis' business activity month by month, in an attempt to cobble together information sufficient to permit him to prepare his own tax returns.

During this process, Mr. Heatley claims to have discovered that Ms. Hujazi was regularly siphoning money out of Ellis' bank account and using it to pay personal expenses. He described large cash withdrawals; checks made out to Ms. Hujazi personally or to professionals he believes she hired to perform work unrelated to Ellis; and other unexplained transactions. Mr. Heatley also claims these amounts as his personal damages and demands that the court declare this debt nondischargeable.

Ms. Hujazi, of course, tells a very different story. She maintains that, whenever Mr. Heatley demanded information, she instructed one of her employees at Bay Cities Financial Corporation (a property management company) to give him whatever he wanted. She also admitted to using some of the rents generated by Ellis for personal expenses, but credibly testified that she repeatedly told Mr. Heatley that she needed and expected to be able to use some of Ellis' income for living expenses, never tried to hide such activity, and flatly denied the existence of any agreement prohibiting her from doing so.

As for other expenses, she denied that they had nothing to do with Ellis. As an example, she explained that she often asked her Bay Cities employees to take trash collected at Ellis to the dump for disposal, and that she gave these employees cash with which to pay disposal fees. She believed that any payments to professionals were appropriate because those professionals did work related to Ellis.

By July 2014, Mr. Heatley's frustration grew so great that he sued SF Corners in state court and succeeded in obtaining an order appointing a receiver over Ellis. Not long thereafter, however, Ms. Hujazi prevailed on her request to terminate the receivership. The order terminating the receivership makes Ms. Heatley responsible for payment of the receiver's fees and costs, including the receiver's attorney's fees. Both parties point to this receivership or the circumstances of its termination as evidence of the other's wrongdoing.

Further complicating all of these matters is the fact that, in September 2012, Ms. Hujazi caused Zuercher to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (Case No. 12-32747). After Ms. Hujazi proved herself incapable of serving as a responsible individual for a debtor-in-possession, the court appointed a Chapter 11 Trustee. Eventually the case was converted to Chapter 7 and Ms. E. Lynn Schoenmann appointed as Chapter 7 Trustee. In March 2015, Ms. Schoenmann succeeded in selling Bayshore for $3.1 million.

Mr. Heatley claims this price was well below Bayshore's fair market value, even though he participated actively in the sale process and never once objected to the proposed sale price

or the court's approval of the sale.[4]  He now claims that Ms. Hujazi's misconduct; specifically, her allegedly fraudulent promise to make a $100,000 capital contribution caused Bayshore to be sold for a depressed price and that this caused damage to Mr. Heatley in the form of diminution in the value of his 11.5% ownership interest.

Still further, in March 2013, several of Ms. Hujazi's creditors filed an involuntary bankruptcy petition against her in this court.  After more than two years of fairly constant skirmishing, the court granted the petitioning creditors' motion for summary judgment and, on November 30, 2015, entered an order for relief against Ms. Hujazi under Chapter 7 of the Bankruptcy Code.  Ms. Janina Hoskins was appointed trustee.

Ms. Hoskins took the position that she could control SF Corners, given that Ms. Hujazi was its sole member and manager. Stepping into Ms. Hujazi's shoes and again, after much litigation, Ms. Hoskins succeeded in selling Ellis in late 2016 for $4,475,000.

Out of this hopelessly tangled web arose this adversary proceeding, which Mr. Heatley filed on March 28, 2016.  Mr. Heatley's complaint asserts three causes of action.  He raises the first under section 523(a)(2)(A) of the Bankruptcy Code. In support of this claim, Mr. Heatley alleges that Ms. Hujazi fraudulently promised to make $100,000 capital contributions toward the improvement of Bayshore and Ellis.  He also alleges

---

[4] According to the court's review of its record, Mr. Heatley raised certain objections to the proposed sale procedures, some of which the court found well-taken.  Mr. Heatley never objected to the proposed or final sale price or to final approval of the sale.

Case: 10-03027   Doc# 31   Filed: 05/31/17   Entered: 05/31/17 15:22:35   Page 10 of 31

that Ms. Hujazi fraudulently promised to reimburse him for funds he spent to improve, repair, and maintain Ellis.  Mr. Heatley claims that he justifiably relied on these fraudulent promises to his detriment and has suffered damages as a result.

Mr. Heatley asserts his second cause of action under section 523(a)(4) of the Bankruptcy Code.  Here, he claims that Ms. Hujazi owed him fiduciary duties based on, alternatively, her status as a licensed real estate broker or as the sole manager of SF Corners and Zuercher, and as an allegedly competent asset manager.  Mr. Heatley maintains that Ms. Hujazi breached these fiduciary obligations by committing fraud, embezzlement, and defalcation through her mismanagement of Ellis; her failure to make capital contributions toward the improvement of Ellis and Bayshore; her failure to reimburse Mr. Heatley for money he spent to improve, maintain, and repair Ellis; and her diversion and waste of Ellis' rental income by using a portion of it for personal and other expenses.

Mr. Heatley's third cause of action is based on section 532(a)(6) of the Bankruptcy Code.  In support of this cause of action, he contends that the same acts that allegedly constitute breaches of Ms. Hujazi's alleged fiduciary obligations were carried out with willful and malicious intent to cause him financial harm, which he argues has occurred.

As explained below, the court has concluded that Mr. Heatley has failed to prove that he is entitled to judgment on any of his claims for relief and that a judgment in Ms. Hujazi's favor is appropriate, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.

Case: 10-03027   Doc# 31   Filed: 05/31/17   Entered: 05/31/17 15:22:35   Page 11 of 31

## II. CONCLUSIONS OF LAW

Under Rule 52(c), "the court may enter judgment as a matter of law . . . with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." Fed. R. Civ. P. 52(c). Rule 52 expressly authorizes a trial court to resolve disputed issues of fact. In deciding whether to enter judgment on partial findings under Rule 52(c), the trial court is not required to draw any inferences in favor of one party or another; rather, the court "may make findings in accordance with its own view of the evidence." Ritchie v. U.S., 451 F.3d 1019, 1023 (9th Cir. 2006).

### A. Section 523(a)(2)(A)

A discharge of the type that Ms. Hujazi might someday receive under Bankruptcy Code section 727 does not discharge "an individual debtor from any debt . . . for money . . . to the extent obtain by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). In order to prevail, the plaintiff must prove all of the following: (1) the existence of a misrepresentation, fraudulent statement or omission by the debtor; (2) that the debtor knew of the falsity or fraudulent nature of his or her statements or omissions or actions at the time they were made; (3) that the debtor intended to deceive the plaintiff; (4) that the plaintiff justifiably relied on the debtor's misrepresentations, omissions, or actions; and (5) that the plaintiff suffered damages as a result of that justifiable reliance. American Express Travel Related Servs. Co. v. Hashemi (In re Hashemi),

MEMORANDUM DECISION FOLLOWING TRIAL

- 12 -

104 F.3d 1122, 1125 (9th Cir. 1996). The plaintiff must prove
these elements by a preponderance of the evidence. Id.

### 1. Alleged Fraudulent Statements or Omissions

Mr. Heatley attributes several fraudulent
misrepresentations to Ms. Hujazi. First, he claims that she
falsely promised to contribute $100,000 to the improvement of
each of Ellis and Bayshore. Next, Mr. Heatley alleges that Ms.
Hujazi falsely promised to reimburse him for all funds he paid
out of pocket toward Ellis' expenses. Further, he maintains
that she promised not to use Ellis' revenues to pay her
personal expenses or that she fraudulently withheld from him
the fact that she was doing so. Finally, Mr. Heatley argues
that Ms. Hujazi fraudulently promised to increase his ownership
share in Ellis from 11.5% to 15.38%.

**a. Alleged Promise of a $100,000 Capital Contribution
(Ellis).** At trial, Mr. Heatley pointed to the Ellis Assignment
Agreement as the basis for his allegation that Ms. Hujazi
falsely promised to contribute $100,000 toward the improvement
of Ellis. The Ellis Assignment Agreement contains no such
promise. What it contains is a provision, pursuant to which
Mr. Heatley was to receive an 11.5% membership interest in an
LLC that the parties never formed. Instead, it appears (not
because the court received evidence proving the point, but only
because the parties did not dispute it) that Mr. Heatley
received an 11.5% ownership interest in Ellis. The court
received no other evidence – written or oral – that proved the
existence of any promise on the part of Ms. Hujazi to make a
$100,000 contribution to the improvement of Ellis; nor did the

Case: 10-03027   Doc# 31   Filed: 05/31/17   Entered: 05/31/17 15:22:35   Page 13 of
31

court receive any evidence from which it might reasonably infer such a promise. Accordingly, Mr. Heatley has failed to prove that Ms. Hujazi made any promise whatsoever to contribute $100,000 to improve Ellis, let alone that she made any such promise fraudulently.

**b. Alleged Promise of a $100,000 Capital Contribution (Bayshore).** Mr. Heatley points to the Bayshore Assignment Agreement as the source of Ms. Hujazi's alleged promise to contribute $100,000 to the improvement of Bayshore. The Bayshore Assignment Agreement contains such a promise, but it is made by Zuercher, not Ms. Hujazi. The court received no briefing whatsoever as to how it might find Ms. Hujazi liable for a promise made by a business trust such as Zuercher.

But even if the court could find Ms. Hujazi liable for a promise made by Zuercher, in order for Mr. Heatley to prevail he must also prove that she made the promise with fraudulent intent. Unfortunately, he has failed to do that, too.

Mr. Heatley points to the fact that, by late September 2012, Ms. Hujazi had caused Zuercher to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code as proof that, when Zuercher executed the Bayshore Assignment Agreement in June, Ms. Hujazi knew that Zuercher would never be able to fulfill its commitment to contribute $100,000 towards Bayshore's improvement. The court is unable to draw such an inference.

Zuercher's Chapter 11 petition was filed on September 26, 2012; the Bayshore Assignment Agreement was effective on June 18, 2012. While that is a relatively short period of time, the

court is not willing to infer from timing alone that Ms. Hujazi knew, in mid-June 2012, that Zuercher would be seeking relief in the bankruptcy court by late September or that she fraudulently withheld that information from Mr. Heatley. There might be any number of reasons why Zuercher filed a bankruptcy petition, many of which could arise on relatively short notice. Without more probative evidence of Ms. Hujazi's fraudulent intent, the court is unable to find that she had such intent.

    **c.   Alleged Promise of Reimbursement.** The next fraudulent promise that Mr. Heatley attributes to Ms. Hujazi is one to reimburse him for all of the funds he expended for the improvement of Ellis. Some of this, Mr. Heatley admits, has been reimbursed and the amount he believes remains due totals approximately $105,000.

    There was no written agreement between Mr. Heatley and Ms. Hujazi governing their ownership or management of Ellis. Mr. Heatley testified that he believes that he and Ms. Hujazi owned Ellis as tenants in common and that this entitles him to reimbursement for all funds he expended to improve and/or maintain Ellis. Unfortunately, Mr. Heatley failed to introduce any documentary or other evidence proving that the parties' form of ownership of Ellis was, in fact, a tenancy in common. Mr. Heatley also failed to provide the court with any legal authority establishing the accuracy of his assumption concerning his entitlement to reimbursement.

    Mr. Heatley did prove that he received reimbursement for some of the funds he expended, and he urges the court to infer from that an agreement to reimburse him for all such expenses.

Ms. Hujazi vehemently denied the existence of any unqualified reimbursement agreement; instead, she testified that she agreed to use Ellis' income to pay some expenses but not others. For example, Ms. Hujazi testified that she refused to approve reimbursement for certain payments made to the unlicensed contractor hired by Mr. Heatley.

Based on the parties' respective testimony (which is all the court has to go on given the absence of documentary evidence relevant to this issue), the court finds and concludes that there was no meeting of the minds between the parties concerning whether Mr. Heatley would be reimbursed for every single dollar he paid toward the improvement or maintenance of Ellis. Without a meeting of the minds, there can be no hard and fast promise, and certainly no fraudulent misrepresentation.

**d. Alleged Promise Not to Use Ellis' Revenues for Personal Expenses.** Mr. Heatley next alleges that Ms. Hujazi fraudulently promised not to use revenue generated by Ellis for personal purposes or that she fraudulently failed to tell Mr. Heatley that she was doing so. According to Mr. Heatley, Ms. Hujazi began siphoning off Ellis' income in 2014, after she took over management of the building. Ms. Hujazi told a different story. According to her, she repeatedly told Mr. Heatley that she needed to use "her" portion of Ellis' revenue to pay living expenses and never tried to hide such activity from Mr. Heatley.

Here again, without a written agreement governing the parties' ownership and management of Ellis, the court has

Case: 10-03027   Doc# 31   Filed: 05/31/17   Entered: 05/31/17 15:22:35   Page 16 of 31

little to go on.  Mr. Heatley suggests that, because the deed
of trust encumbering Ellis gave Sequoia a security interest in
Ellis and the rental income it generated, the court can infer
on the part of Ms. Hujazi a promise not to use Sequoia's cash
collateral for any purpose unrelated to satisfaction of the
borrowers' obligation to Sequoia and payment of other debts
relating to Ellis in order to prevent waste of or damage to
Sequoia's collateral.  Unfortunately, this evidence alone does
not permit Mr. Heatley to prevail.

The grant of an interest in real property and its proceeds
pursuant to a deed of trust does not mean a borrower/trustor
may never use the income generated by the real property for any
purpose other than to repay the debt to the beneficiary or to
maintain or improve the property.  Where a property generates
income sufficient to service the debt secured by the property
and to pay other expenses associated with the property, the
borrower/trustor is free to use any remainder in any fashion he
or she sees fit.

At no point during trial did Mr. Heatley provide the court
with any evidence of Ellis's income or expenses, aside from a
single statement of account from Sequoia that indicated that
the monthly payment on its debt totaled $10,822.50.  Beyond
this, the court received only Ms. Hujazi's testimony, in which
she insisted that, when she took over Ellis' management, it
generated approximately $29,000/month in rents and, just three
months later, it generated approximately $41,000 per month in
rents.  This income stream should have been sufficient to
service the debt to Sequoia.  And according to the Sequoia

statement of account, it was.  Between March 23, 2012 and July 2014, the required payment to Sequoia was made each month, albeit late on occasion.  Thus, even if the court construes the Sequoia deed of trust as a promise not to use Ellis' revenues for any purpose other than repayment of the debt to Sequoia, it appears that promise was kept, at least between March 23, 2012 and July 2014.

But more to the point, the court simply found Ms. Hujazi more credible than Mr. Heatley.  Ms. Hujazi consistently denied that she promised not to use Ellis' revenue for any purpose unrelated to that building.  She also testified convincingly that she made no effort to hide her use of Ellis' revenue from Mr. Heatley.  On this point in particular, Ms. Hujazi's testimony is corroborated by Mr. Heatley's, in which he admitted that (a) he always had access to the bank account he and Ms. Hujazi used to operate Ellis; and (b) Ms. Hujazi could do whatever she wanted with her share of Ellis' revenue.  With these admissions, Mr. Heatley helped convince the court that Ms. Hujazi neither fraudulently promised never to use Ellis' revenue for any personal expenses nor fraudulently hid such activity from him.

**e.  Alleged Promise of a 15.38% Ownership Interest.**  In his complaint and trial brief, Mr. Heatley argued that Ms. Hujazi fraudulently promised to increase his share in Ellis from 11.5% to 15.38%.  During trial, however, he failed to introduce a single shred of evidence – written or oral – that proved the existence of any such promise.

Case: 10-03027   Doc# 31   Filed: 05/31/17   Entered: 05/31/17 15:22:35   Page 18 of
31

**2. Causation.**

With respect to the alleged promises of $100,000 contributions to the improvement of Ellis and Bayshore, Mr. Heatley contends that Ms. Hujazi's failure to keep these promises damaged him by diminishing the value of Ellis and Bayshore, which in turn diminished the value of his interest in those properties. Mr. Heatley has failed to prove that allegation.

He admitted that both properties were troubled when he, SF Corners, and Zuercher acquired them. The parties do not dispute that they were never able to completely cure the problems from which the properties suffered during the time they owned them. The parties also do not dispute that both of them assumed responsibility for managing the building, albeit at different times. The court received no evidence whatsoever that ties any diminution in value (to the extent there was one – a fact that went unproven at trial)[5] to acts carried out exclusively by Ms. Hujazi. Without such proof, Mr. Heatley cannot prevail on his claim that these allegedly fraudulent promises caused him any form of damage.

**B. Section 523(a)(4)**

The Bankruptcy Code renders nondischargeable any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." In his complaint, Mr. Heatley alleged that Ms. Hujazi "acted in a fiduciary capacity . . . based upon her disclosed status as a licensed real estate

---

[5] See footnote 4. Mr. Heatley also did not oppose the sale of Ellis.

professional, competent asset manager, and sole manager of her controlled entities." He goes on to complain that Ms. Hujazi "breached her fiduciary duties to [him] while acting in a fiduciary capacity" and "committed defalcations while acting in a fiduciary capacity." In his trial brief, Mr. Heatley changed his tune, arguing not only that Ms. Hujazi had committed fraud or defalcation while acting in a fiduciary capacity, but that she had embezzled several hundred thousand dollars from . . . both properties."[6]

### 1. Fraud or Defalcation in a Fiduciary Capacity.

To prevail under this facet of section 523(a)(4), Mr. Heatley must prove not only that Ms. Hujazi committed fraud or defalcation, but that she acted in a fiduciary capacity when doing so. Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 378 (B.A.P. 9th Cir. 2011) (citing In re Teichman, 774 F.2d 1395, 1398 (9th Cir. 1985)).

The court has already found and concluded that Ms. Hujazi did not act fraudulently, so Mr. Heatley's success depends upon proving that Ms. Hujazi committed defalcation while acting in a fiduciary capacity. Unfortunately, he has failed on both counts.

**a. Fiduciary Capacity.** The broad definition of fiduciary under nonbankruptcy law – a relationship involving trust, confidence, and good faith – does not apply in the

---

[6] This quote marks the first and only time Mr. Heatley alleged that Ms. Hujazi misused revenue generated by Bayshore, as well as Ellis. At trial, Mr. Heatley introduced no evidence whatsoever pertaining to revenue generated by Bayshore, Bayshore's expenses, or Ms. Hujazi's use or misuse of Bayshore revenue. Accordingly, the court will analyze Mr. Heatley's 523(a)(4) claim as pertaining to Ellis only.

discontinuityability context, in which the Ninth Circuit has
adopted a much narrower definition of "fiduciary." Honkanen,
446 B.R. at 378 (citing Cal-Micro, Inc. v. Cantrell (In re
Cantrell), 329 F.3d. 1119, 1125 (9th Cir. 2003); Lewis v. Short
(In re Short), 818 F.2d 693, 695 (9th Cir. 1987); Ragsdale v.
Haller, 780 F.2d 794, 796 (9th Cir. 1986); Woosley v. Edwards
(In re Woosley), 117 B.R. 524, 529 (B.A.P. 9th Cir. 1990)).
The fiduciary relationship must be one arising from an express
or technical trust. Honkanen, 446 B.R. at 378-79. "Fiduciary"
in this context is therefore a narrowly construed question of
federal law, although state law can be consulted "to ascertain
whether the requisite trust relationship exists." Cantrell,
329 F.3d at 1125 (citations omitted).

For many of the past 25 years, courts within the Ninth
Circuit have applied a combined statutory and caselaw analysis
to determine the existence of fiduciary capacity. These courts
focused on duties arising under state law, rather than on
duties arising from the existence of an express trust.
Accordingly, courts found that various professionals, when
acting as such, were fiduciaries for purposes of section
523(a)(4). See, e.g., Woosley, 117 B.R. at 529 (California
real estate broker is a fiduciary); Lock v. Scheuer (In re
Scheuer), 125 B.R. 584, 592 (Bankr C.D. Cal. 1991) (securities
broker is a fiduciary).

Caselaw has evolved, however, and the current rule
recognizes that state law fiduciary duties alone are
insufficient to establish the fiduciary capacity required by
section 523(a)(4). Honkanen, 446 B.R. at 378-79 ("[t]o fit

within § 523(a)(4), the fiduciary relationship must be one arising from an express or technical trust that was imposed before, and without reference to, the wrongdoing that caused the debt"); Evans v. Pollard (In re Evans), 161 B.R. 474, 478 (B.A.P. 9th Cir. 2001) (even if a court finds that there are general fiduciary duties between the parties, that is "not sufficient [if there is an] absence of an express or technical trust relationship with an identifiable trust res"). In order for a fiduciary relationship of the type required by section 523(a)(4) to exist, the applicable state law must clearly define fiduciary duties *and* identify trust property. Id. (citing Runnion v. Pedrazzini (In re Pedrazzini), 644 F.2d 756, 759 (9th Cir. 1981) (emphasis added)). Accordingly, the fact that the defendant is a real estate broker is insufficient to cause liability to adhere under section 523(a)(4) unless a plaintiff can also prove the existence of an express or technical trust.

In the case at bar, the parties do not dispute that Ms. Hujazi was, during the period of time relevant to this adversary proceeding, a licensed California real estate broker. This means that, under certain circumstances, Ms. Hujazi served as a fiduciary and acted in a fiduciary capacity.

Those circumstances are not presented here, for several reasons. First, both the Ellis Assignment Agreement and the Bayshore Assignment Agreement contain express disclaimers stating: "Assignor, Assignee, and/or their respective affiliates or principals, are licensed real estate brokers; however, none of said parties are acting in their capacity as

licensed real estate brokers with respect to this transaction."
Accordingly, Mr. Heatley's argument that Ms. Hujazi acted in a
fiduciary capacity with respect to any promises made in those
agreements must fail.

The court also received no evidence or argument that
supports a finding that Ms. Hujazi acted in her capacity as a
licensed real estate broker in managing Ellis or that the facts
proved at trial established the existence of an express or
technical trust under California law.  The evidence Mr. Heatley
introduced proves only that SF Corners and Mr. Heatley co-owned
Ellis, that Mr. Heatley and Ms. Hujazi both assumed
responsibility for managing Ellis at various times, and that
beyond that, they were unable to agree on much.  None of that
proves the existence of an express or technical trust under
California law sufficient to show that any debts owed by Ms.
Hujazi to Mr. Heatley should be declared nondischargeable under
section 523(a)(4).  Keitel v. Heubel, 126 Cal. Rptr. 2d 763,
773 (Ct. App. 2002) (under California law, an express trust
requires five elements:  (a) present intent to create a trust;
(b) a trustee; (c) trust property; (d) proper legal purpose;
and (e) a beneficiary); Royal Indem. Co. v. Sherman, 269 P.2d
123, 125 (Cal. Ct. App. 1954) (describing technical trusts
under California law as "those arising from the relation of
attorney, executory, or guardian, and not debts due by a
bankruptcy in the character of an agent, factor, commission
merchant, and the like"); Young v. Clark, 93 P. 1056, 1057
(Cal. Ct. App. 1907) (a technical trust is not implied by
contract).

The same holds true for Mr. Heatley's arguments that Ms. Hujazi acted as a fiduciary by allegedly holding herself out to be a "competent asset manager" or by serving as "sole manager of her controlled entities." Neither of these theories were developed in Mr. Heatley's trial brief beyond these conclusory statements, and Mr. Heatley did not cite to any legal authority that might support them. Having failed to prove the elements necessary to establish the existence of an express or technical trust, Mr. Heatley's claim that Ms. Hujazi acted in a fiduciary capacity fails.

   **b.   Defalcation.**  Even if Ms. Hujazi can somehow be shown to have acted in a fiduciary capacity, Mr. Heatley failed to prove that Ms. Hujazi committed defalcation while acting in that capacity.  A "defalcation" under section 523(a)(4) requires the "misappropriation of trust funds or money held in any fiduciary capacity; [or the] failure to properly account for such funds." <u>Stephens v. Bigelow</u> (<u>In re Bigelow</u>), 271 B.R. 178, 186 (B.A.P. 9th Cir. 2001).  Defalcation requires a culpable state of mind, involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." <u>Bullock v. BankChampaign, N.A.</u>, 133 S.Ct. 1754, 1759 (2013).

   The court has already found that Ms. Hujazi did not misappropriate money that came into her hands as the result of her management of Ellis.  She also did not fail to properly account for such funds, as whenever Mr. Heatley requested financial information, Ms. Hujazi instructed her employees to provide him with whatever he wanted.  In addition, Mr. Heatley

did not argue that Ms. Hujazi somehow secreted money away; rather, he concedes that all transactions – even those he contends were improper – were run through the dedicated bank account that the parties established for Ellis.  Mr. Heatley concedes that, during all periods relevant to this action, he had unfettered access to that account and was able to obtain bank statements, copies of checks, etc.

Ms. Hujazi also lacked the state of mind necessary to prove culpability for defalcation.  The court has already concluded that she did not act fraudulently, and the evidence also fails to prove that she was grossly reckless.  She tried to do what she believed was right.  The fact that she failed, even failed miserably, does not mean she committed defalcation.

**2.  Embezzlement.**

As the court has previously noted, Mr. Heatley devotes just half a sentence of his trial brief to embezzlement as grounds for a finding of nondischargeability under section 523(a)(4).  His complaint does not allege embezzlement at all. The evidence Mr. Heatley presented at trial does nothing to strengthen this extremely weak reed.

In adversary proceedings such as this, federal law provides the definition of embezzlement.  <u>First Delaware Life Ins. Co. v. Wada</u> (<u>In re Wada</u>), 210 B.R. 572, 576 (B.A.P. 9th Cir. 1997).  In order to prevail, Mr. Heatley must prove all of the following:  (1) property rightfully in the possession of a nonowner; (2) the nonowner's appropriation of the property to a use other than that to which it was entrusted; and (3) circumstances indicating fraud.  <u>Transamerica Commercial Fin.</u>

Case 10-03027   Doc# 31   Filed: 05/31/17   Entered: 05/31/17 15:22:35   Page 25 of 31

Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991).  Mr. Heatley bears the burden of proving these elements by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 286 (1991).

Mr. Heatley failed to prove a single one of these requirements.  First, Mr. Heatley admitted that Ms. Hujazi was at least a part owner of the income generated by Ellis. Accordingly, she was not a "nonowner" as must be shown in order to prevail on an embezzlement claim.  Second, and as the court has already concluded, Ms. Hujazi did not misappropriate property.  Finally, and as the court has already concluded, no circumstances indicating fraud exist.  Mr. Heatley's claim of embezzlement cannot stand.

**C.    Section 523(a)(6)**

A bankruptcy discharge does not relieve an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  In order to prevail on a claim under section 523(a)(6), the plaintiff must prove by a preponderance of the evidence that the defendant's conduct was both willful and malicious.  Ormsby v. First Am. Title Co. (In re Ormsby), 591 F.3d 1199, 1206 (9th Cir. 2010); Barboza v. New Form, Inc. (In re Barboza), 545 F.3d 702, 706 (9th Cir. 2008) (the "willful" requirement is separate and distinct from the "malicious" requirement); Jett v. Sicroff (In re Sicroff), 401 F.3d 1101, 1106 (9th Cir. 2005) (burden of proof).

Willfulness requires a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to

injury." <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998); <u>Ditto v. McCurdy</u>, 510 F.3d 1070, 1078 (9th Cir. 2007) (same).  Put another way, the defendant must intend the consequence of the act, not simply the act itself, in order for a debt caused by that act to be declared nondischargeable under section 523(a)(6).  <u>Ormsby</u>, 591 F.3d at 1206.

For purposes of section 523(a)(6), the Ninth Circuit has adopted a subjective standard.  <u>Carillo v. Su</u> (<u>In re Su</u>), 290 F.3d 1140, 1146 (9th Cir. 2002).  Willfulness requires a "subjective motive to inflict injury" or a subjective belief that "injury is substantially certain to result" from one's conduct in order for liability under section 523(a)(6) to adhere.  <u>Ormsby</u>, 591 F.3d at 1206.

Malicious injury "involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse."  <u>Ormsby</u>, 591 F.3d at 1207.  Malice may be implied from the wrongful nature of the act itself.  <u>Thiara v. Spycher Bros.</u> (<u>In re Thiara</u>), 285 B.R. 420, 434 (B.A.P. 9th Cir. 2002).  Malice does not require a showing of biblical malice, i.e., personal hatred, spite, or ill will.  <u>Thiara</u>, 285 B.R. at 434 n. 15 (citing <u>McIntyre v. Kavanaugh</u>), 242 U.S. 138, 141-42 (1916)).

In his complaint, Mr. Heatley accuses Ms. Hujazi of conning him into providing her access to Ellis' bank account and thereafter using that account to line her own pockets, while Ellis fell into disrepair and was ultimately lost.  In his trial brief, Mr. Heatley once again changed his story, accusing Ms. Hujazi of raiding bank accounts for both Ellis and

Bayshore.  The only proof introduced by Mr. Heatley pertained strictly to Ellis, so the court will not consider his claim that Ms. Hujazi raided Bayshore's coffers, too.  In any event, Mr. Heatley's claim fails.

**1.  Alleged Willful Conduct.**

For many of the same reasons that the court declined to find that Ms. Hujazi made fraudulent representations to Mr. Heatley or that she fraudulently withheld information from him, the court declines to find that Ms. Hujazi engaged in willful conduct sufficient to support a finding that any debts she might have owed to Mr. Heatley are nondischargeable under section 523(a)(6).  Mr. Heatley presented not a shred of evidence that suggests Ms. Hujazi deliberately intended to injure him.

Ms. Hujazi admitted to using Ellis' revenue for personal expenses, but she credibly testified that she did not use Ellis' revenue to the extent Mr. Heatley suggests, that she had told him she would do so, that she never tried to hide it from him, and that she and Mr. Heatley had not agreed otherwise.  This course of conduct might not have been wise, but the court finds it was neither fraudulent nor malicious.

With respect to Mr. Heatley's allegation that Ms. Hujazi falsely promised to reimburse him for all expenses, the court reiterates its finding that she made no such promise.  Again, the evidence introduced by Mr. Heatley proved only that Ms. Hujazi agreed that Ellis' revenue could be used to reimburse some — not all — of Mr. Heatley's expenses.  And Ms. Hujazi credibly testified that she disagreed with other expenses, such

as, for example, those relating to work done by an unlicensed
contractor (hired by Mr. Heatley) who failed to obtain
necessary permits.

Mr. Heatley failed to prove that Ms. Hujazi possessed a
subjective intent to cause him financial injury; therefore, he
is not entitled to judgment in his favor on his claim under
section 523(a)(6).

**2. Alleged Malicious Conduct.**

Mr. Heatley also has failed to prove that Ms. Hujazi's
conduct was malicious. As explained in the court's discussion
of his claim under section 523(a)(2)(A), Mr. Heatley has failed
to prove that Ms. Hujazi's refusal to agree to reimbursement of
all funds Mr. Heatley expended toward Ellis' improvement or her
use of Ellis' income for certain personal expenses were
wrongful acts. Although he described her use of Ellis' income
for personal expenses as improper, he later admitted that she
could use "her" share of Ellis' revenues in whatever manner she
wished. And Ms. Hujazi's testimony concerning why she would
not agree to reimburse Mr. Heatley for certain expenses was
credible. In light of this, the court cannot conclude that Ms.
Hujazi's conduct was malicious; therefore, Mr. Heatley cannot
prevail on his section 523(a)(6) claim.

Case: 10-03027   Doc# 31   Filed: 05/31/17   Entered: 05/31/17 15:22:35   Page 29 of 31

1    **III. CONCLUSION**

2      For the foregoing reasons, the court finds in favor of Ms.

3 Hujazi on all counts asserted in Mr. Heatley's complaint.  The

4 court will separately enter a judgment.

5

6

7                           **\*\*END OF ORDER\*\***

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM DECISION FOLLOWING TRIAL**

- 30 -

## Court Service List

[None]